## UNITED STATES DISTRICT COURT
## DISTRICT OF MARYLAND

TREVOR CHAPLICK,
*Trustee for Canal Vista Trust,*

      Plaintiff,

      v.

JENG FEN MAO and
CHIAYEE CHEW MAO,

      Defendants.

Civil Action No. TDC-13-2070

## MEMORANDUM OPINION

This case arises out of the aborted sale of a Maryland home overlooking the Potomac River. Defendants Jeng Fen and Chiayee Chew Mao (collectively, "the Maos"), husband and wife, made an offer on the property, subject to a financing contingency, through a standard form contract of sale. After some negotiation, Plaintiff Trevor Chaplick accepted the offer on behalf of the property's owner, Canal Vista Trust, of which he is the sole trustee. However, when the Maos were unable to obtain financing, Chaplick terminated the contract, sold the house to another buyer for more money, and sued the Maos for damages.

Presently pending is Chaplick's Motion for Partial Summary Judgment, the Maos' Cross-Motion for Summary Judgment, and Chaplick's Motion to Seal. A hearing was held on the two Motions for Summary Judgment on February 3, 2016. For the reasons set forth below, Chaplick's Motion to Seal is DENIED, the Maos' Cross-Motion for Summary Judgment is DENIED, and Chaplick's Motion for Summary Judgment is GRANTED.

## BACKGROUND

### I.     The Contract

In November 2012, Chaplick, on behalf Canal Vista Trust, listed for sale the residential property located at 13728 Canal Visit Court in Potomac, Maryland ("the Property") with an asking price of $1,399,999.  On January 22, 2013, the Maos offered to purchase the home for a gross purchase price of $1,300,000.  The main document constituting their offer is a standard form residential contract of sale published by the Maryland Association of Realtors ("MAR") ("the Contract").  The Maos' offer included several standard MAR addenda.

The Contract identified the seller as Canal Vista Trust, the buyers as Jeng Feng Mao ("Mr. Mao") and Chiayee Chew Mao ("Mrs. Mao"), the Property location, the offer price, a deposit amount of $10,000, and a settlement date of March 1, 2013.  It contained a standard "Time is of the Essence" clause.  Pl.'s Mot. Partial Summ. J. ("Pl.'s Mot.") Ex. 3, Proposed Contract at 2.[1]

Paragraph 9, entitled "Financing," consists of standard MAR form contract language that the "Buyer's obligation to purchase the property is contingent upon Buyer obtaining a written commitment for a loan secured by the Property."  *Id.* ¶ 9.  Based on information checked off or filled into blanks in Paragraph 9, the type of loan for which a written commitment needed to be secured was a conventional loan of $800,000, for a 30-year term, at an interest rate of 4.000 percent.  Paragraph 10, entitled "Financing Application and Commitment," provided that the Buyer agreed to "make a written application for the financing" within "30 days from the Date of Contract Acceptance."  *Id.* ¶ 10.  It further provided that "[i]f such written financing commitment

---

[1]   Citations are to the page numbers in the original documents.  When exhibits do not have page numbers, or contain multiple sets of page numbers, citations are to the page numbers assigned by the Court's Case Management/Electronic Case Files system.

is not obtained by Buyer within thirty (30) days," either the "Seller, at Seller's election and upon written notice to Buyer, may declare this Contract null and void and of no further legal effect," or the "Buyer, upon written notice to Seller which shall include written evidence from the lender of Buyer's inability to obtain financing as provided in Paragraph 9 of this Contract, may declare this Contract null and void and of no further legal effect." *Id.* All of the language in this paragraph consisted of the standard language in the MAR form, with the exception of the 30-day time limits, which were typed into the form.

Among the addenda attached to the Contract, however, was the standard form Montgomery County Jurisdictional Addendum to Sales Contract ("Montgomery County Addendum"), which, among other things, contained an additional provision on financing. Paragraph 13 of the Montgomery County Addendum, entitled "Financing," states "[t]he provisions of this paragraph shall supersede the "FINANCING, FINANCING APPLICATION AND COMMITMENT and ALTERNATE FINANCING paragraphs of the MAR contract" consisting of Paragraphs 9, 10, and 11 of the Contract. Pl.'s Mot. Ex. 3, Montgomery County Addendum ¶ 13. Because a box in Paragraph 13 stating "This contract is not contingent on Financing" was not checked, this paragraph indicated that the contract was contingent on the Maos obtaining financing. *Id.* In place of the financing contingency terms of Paragraphs 9 and 10 of the Contract, Paragraph 13 of the Montgomery County Addendum, based on boxes checked by the parties, stated only that the Buyer will obtain a fixed rate, conventional loan. Paragraph 13 contained no additional details about the terms of this loan, but included the language "See Addendum Attached." *Id.* No such addendum was included with the Contract.

The Contract also set forth the Maos' responsibilities in pursuing financing. Under Paragraph 28 of the Contract, if the Buyer (1) "has misrepresented Buyer's financial ability to

consummate the purchase of the Property"; (2) "fails to apply for . . . financing within the period

herein specified"; (3) "fails to pursue financing diligently and in good faith"; (4) "makes any

misrepresentations in any document relating to financing"; or (5) "takes (or fails to take) any

action which causes Buyer's disqualification for financing," then "Buyer shall be in default," and

the Seller "may elect by written notice to Buyer, to terminate this Contract and/or pursue the

remedies set forth under the Default paragraph of this Contract." Proposed Contract ¶ 28.

> In Paragraph 33, the Contract also provided that:

> Buyer and Seller are required and agree to make full settlement in accordance
> with the terms of this Contract and acknowledge that failure to do so constitutes a
> breach hereof.  If Buyer fails to make full settlement or is in default due to
> Buyer's failure to comply with the terms, covenants, or conditions of this
> Contract, the initial Deposit and additional Deposits (the "Deposit") may be
> retained by Seller as long as a Release of Deposit of Agreement is signed and
> executed by all parties, expressing that said Deposit may be retained by Seller. In
> the event the parties do not agree to execute a Release of Deposit Agreement,
> Buyer and Seller shall have all legal and equitable remedies.

*Id.* ¶ 33.

In making their offer, the Maos initialed each page of the Contract and signed it and the

addenda. On January 22, 2013, they sent to Chaplick the Contract with addenda.  On January 25,

2013 they sent a letter from Mortgage Capital Partners, Inc. ("MCP"), their lender, stating that

they were credit-approved for a 30-year conventional loan of $800,000 at a fixed interest rate of

3.875 percent. MCP stated that the credit approval was subject to a review of the final contract

of sale, a satisfactory appraisal report, evidence of hazard insurance, review of the title binder

and insured closing letter, and a satisfactory termite report.

Upon receiving the Maos' offer, Chaplick agreed with nearly all of the proposed

language; the standard form language of the Contract and addenda remained untouched.  He

made a few handwritten changes, including changing the time period for the Maos to apply for

financing from 30 days to 15 days. Chaplick did not offer any addendum relating to financing as referenced in Paragraph 13 of the Montgomery County Addendum. On January 28, 2013, Chaplick initialed each page of the Contract and signed it and each of the addenda.

Upon receiving Chaplick's counteroffer, the Maos made four handwritten edits of their own: they changed the date of offer to January 30, 2013; changed the time period to apply for financing back to 30 days; changed the date of settlement to March 21, 2013; and clarified that the wall oven included with the Property consisted of one unit with two ovens.

Upon receiving the Maos' changes, Chaplick initialed next to each of them. At this point, both parties had signed the Contract and its addenda, and they had initialed next to all handwritten changes. The parties agree that this is the final version of the Contract.

## II.    Financing

On February 8, 2013, the Maos applied for a loan with MCP, a firm they had used to secure loans for previous transactions. Along with their application, the Maos submitted "a lot of asset documents, including their business asset documents." Defs.' Cross-Mot. Summ. J. ("Defs.' Cross-Mot.") Ex. 5, Yeewen Chang Dep. at 24.

Despite their prompt application, the Maos soon came to the conclusion that they could not obtain a written financing commitment or an appraisal by the dates set forth in the Contract. Accordingly, on February 21, 2013, they asked for an extension. That same day, the parties executed a General Addendum to the Contract, which extended the Maos' deadline to obtain a written loan commitment by seven days to March 8, 2013.

On March 7, 2013, one day before the seven-day period was set to expire, Chaplick's real estate agent asked Mrs. Mao for an update on the loan approval process. Mrs. Mao responded with a letter from MCP entitled "Mortgage Loan Commitment" ("the Commitment Letter"),

5

signed by MCP loan officer Yeewen Chang, and dated March 7, 2013. The Commitment Letter stated that the Maos' application for a 30-year, first mortgage of $870,000, at a 4.000 percent interest rate, had been approved subject to the following conditions: quality control prior to settlement, all underwriting and closing conditions, an appraisal review, and receipt and review of the Maos' 2012 Internal Revenue Service ("IRS") tax transcript. During her deposition, Mrs. Mao agreed that they were required to obtain a written financing commitment under the contract and acknowledged that she sent the Commitment Letter "to make sure we can buy the house." Pl.'s Mot. Ex. 1, Mrs. Mao Dep. at 40–41. Based on this letter, Chaplick kept the property off the market. At this point, Chaplick and Mr. Mao intended to proceed to closing.

Ultimately, however, the parties would not close on the Property because the Maos were unable to meet all of the conditions relating to their loan. The Maos made several unsuccessful attempts to meet one of the conditions in the Commitment Letter: providing their 2012 tax transcript for review. At the time of their loan application, before the Commitment Letter was issued, MCP informed the Maos that it would need their 2012 tax transcript in order to approve the loan. On February 8, 2013, the same day she filed the loan application, Mrs. Mao mailed the Maos' 2012 tax return to the IRS and wrote checks to the state and federal tax authorities. On February 27, 2013, the IRS processed the federal check. Obtaining the Mao's tax transcript would prove to be more difficult. On February 19, 2013, MCP requested the Maos' tax transcript through an independent credit validation agency, only to be told that the 2012 tax transcript was not available. After this initial request, MCP requested the transcript seven additional times between March 8, 2013 and May 9, 2013. Sometime before March 21, 2013, the settlement date, Mr. Mao went to the IRS office in Wheaton, Maryland to seek the tax transcript. He also contacted his congressman's office to request assistance in expediting the

process.  MCP finally received the tax transcript on June 13, 2013, several months after the March 21, 2013 closing date.

The Maos also failed to meet other conditions.  Unbeknownst to either the Maos or Chaplick, MCP had retained an underwriter, EverBank, which set a variety of conditions before it would issue the loan.  On March 18, 2013, EverBank issued a Loan Decision ("the March 18 EverBank Decision") to MCP approving a loan for $870,000 subject to multiple "Prior to Closing" conditions, which had to be fulfilled within 72 hours of closing, and several "At Closing/Prior to Disbursement" conditions.  Pl.'s Mot. Ex. 10, March 18 EverBank Decision at 3.  Many of these conditions consisted of requirements to submit documentation verifying the Maos' employment, income, specific assets, and specific debts.  These conditions included submitting documentation of the Mao's ownership interest in The Essential Realty Group, documentation of Mrs. Mao's interest in a company called Serendipity, LLC and proof of receipt of the proceeds from a sale of Serendipity shares, the terms and conditions for withdrawal of funds from a Thrift Savings Plan account, documentation relating to recent large bank deposits, verification that a particular account had been closed and no new debts had been incurred, and the 2012 IRS transcript.  Other conditions required the Maos to submit documentation relating to the Contract or the Property, such as legible copies of certain addenda to the Contract, proof of a hazard insurance policy, a copy of the deposit check, information on fees and commissions paid as part of the transaction, a termite inspection report, and proof that all liens on the Property had been satisfied.  The Maos also had to establish that they had certain funds available for closing and as reserves following closing.  According to EverBank, many of the conditions in the March 18 EverBank Decision were "standard" underwriting conditions.  Pl.'s Mot. Ex. 11, Menocal Decl. ¶ 4.

Soon after EverBank issued its loan decision, MCP requested four items from the Maos: a letter explaining the addenda in the Contract, documentation of the sale of their stake in Serendipity, a signed and reviewed copy of an attached "letter of explanation," and the Maos' most recent bank statements. Defs.' Cross-Mot. Ex. 10, March 18 Loan E-mails, at 2. Within three hours, the Maos sent back a copy of their bank statements and documents relating to Serendipity.

In response to one of EverBank's conditions, which required the Maos to have $102,433 in reserve once settlement finished, MCP asked EverBank to increase the loan several times so that the Maos had sufficient funds. On March 19, 2013, MCP asked EverBank to increase the Maos' loan to $910,000. Then, on March 20, 2013, MCP asked EverBank to increase the loan to $920,000. Finally, on March 21, 2013, the day closing was scheduled, MCP asked EverBank to increase the loan to $930,000. On March 26, 2013, EverBank approved this final loan and issued another Loan Decision to MCP for $930,000 at a 3.75 percent interest rate. The March 26 EverBank Decision indicated that although many of the conditions from the March 18 EverBank Decision had been satisfied, several still remained, including providing documentation relating to a large deposit to a BB&T bank account, providing asset statements for two other bank accounts, providing additional documentation relating to the ownership interest in the Essential Realty Group, and providing the 2012 IRS transcript. The March 26 EverBank Decision also added three new conditions, including providing an explanation and documentation relating to four recent deposits to a CitiBank account and providing a legible copy of an addendum relating to payment of certain closing costs by the seller. On April 18, 2013, because the credit application was incomplete, EverBank denied the loan.

8

Prior to the March 21 closing date, facing the strong possibility that they could not meet all of the conditions necessary to obtain their loan, the Maos asked Chaplick for an extension of the closing date. On March 20, Chaplick agreed to extend the settlement date to April 19, 2013, but only if the Maos made a $130,000 good faith earnest money deposit that would be credited against the purchase price at the time of settlement, but forfeited if settlement did not occur by that date. Through his real estate agent, Chaplick also threatened to file a lawsuit against the Maos on March 22, and submit complaint to the real estate commission, if they did not close by March 21 or agree to his proposed terms for an extension. The Maos declined this offer.

On March 22, 2013, Chaplick terminated the Contract and re-listed the Property. On April 15, 2013, Chaplick executed a new contract with another buyer and closed the sale in June 2013 for $1,312,500. On July 17, 2013, Chaplick made good on his threat to sue the Maos by filing his Complaint in this Court.

### III.    Procedural History

The Motion for Partial Summary Judgment and Cross-Motion for Summary Judgment are not the first such motions before the Court. On August 28, 2013, the day after discovery began, the Maos filed a Motion for Summary Judgment. On December 2, 2013, Chaplick filed a Cross-Motion for Summary Judgment. On March 5, 2014, the Court (Grimm, J.) denied both Motions, finding that with discovery having yet to proceed, there remained genuine disputes of material fact. Following extensive discovery, Chaplick filed the present Motion for Partial Summary Judgment on March 10, 2015, seeking summary judgment on liability for breach of contract. On April 1, 2015, the Maos filed their Cross-Motion for Summary Judgment, seeking summary judgment in their favor based in large part on the terms of the Montgomery County Addendum.

## DISCUSSION

### I.    Motion to Seal

On March 10, 2015, Chaplick filed an unopposed Motion to Seal Exhibits 1 through 3, 5, and 7 through 15 of his Motion for Partial Summary Judgment.   Although the Motion is unopposed, the parties' desire to have materials sealed is not the only consideration. The public has a common law right to inspect and copy judicial records and documents. *See Nixon v. Warner Commc'ns, Inc.*, 435 U.S. 589, 597 (1978). The public's right of access to dispositive motions and the accompanying exhibits is protected to an even higher degree by the First Amendment. *Rushford v. New Yorker Mag., Inc.*, 846 F.2d 249, 253 (4th Cir. 1988). Thus, the Court has an obligation to review a motion to seal to determine whether the public's right of access is outweighed by competing interests. *See In re Knight Publ'g Co.*, 743 F.2d 231, 235 (4th Cir. 1984).

In this District, a party filing a motion to seal must comply with Local Rule 105.11, which requires the submission of "proposed reasons supporting the specific factual representations to justify the sealing" and "an explanation why alternatives to sealing would not provide sufficient protections." D. Md. Local R. 105.11; *Butler v. DirectSAT USA, LLC*, 876 F. Supp. 2d 560, 576 (D. Md. 2012). Here, the only justification offered by Chaplick is the fact that a protective order governing the use of documents was previously entered in this case. Such a protective order, however, is insufficient by itself to justify the continued sealing of filings in court. *See Va. Dep't of State Police v. Wash. Post*, 386 F.3d 567, 576 (4th Cir. 2004) (quoting *Rushford*, 846 F.2d at 253).

A party filing suit in federal court has chosen a public forum for resolving the dispute and therefore must assume, absent a clearly identified justification, that the materials submitted in the

litigation will be available to the public.  Although the Court has previously warned Chaplick that the protective order, on its own, is an insufficient basis for granting a motion to seal, Chaplick has offered nothing more.  The Court's review of the materials at issue has not identified any basis for sealing that would override the public's right of access.  Accordingly, the Motion to Seal is denied.

## II.     Legal Standards

Under Federal Rule of Civil Procedure 56(a), the Court grants summary judgment if the moving party demonstrates there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  In assessing the Motion, the Court views the facts in the light most favorable to the nonmoving party, with all justifiable inferences drawn in its favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).  The Court may rely only on facts supported in the record, not simply assertions in the pleadings. *Felty v. Grave–Humphreys Co.*, 818 F.2d 1126, 1128 (4th Cir. 1987).

The nonmoving party has the burden to show a genuine dispute on a material fact. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986).  "A material fact is one that might affect the outcome of the suit under the governing law." *Spriggs v. Diamond Auto Glass*, 242 F.3d 179, 183 (4th Cir. 2001) (quoting *Anderson*, 477 U.S. at 248) (internal quotation marks omitted).  A dispute of material fact is only "genuine" if sufficient evidence favoring the nonmoving party exists for the trier of fact to return a verdict for that party. *Anderson*, 477 U.S. at 248–49.

"When faced with cross-motions for summary judgment, the court must review each motion separately on its own merits 'to determine whether either of the parties deserves

judgment as a matter of law.'" *Rossignol v. Voorhaar*, 316 F.3d 516, 523 (4th Cir. 2003) (quoting *Philip Morris, Inc. v. Harshbarger*, 122 F.3d 58, 62 n.4 (1st Cir. 1997)).   When considering each individual motion, the court views the evidence and draws all inferences in favor of the nonmoving party. *Id.*

Because the Contract stipulates that it shall be interpreted and construed in accordance with Maryland law, Maryland law applies. *See* Contract ¶ 55; *see also Kronovet v. Lipchin*, 415 A.2d 1096, 1104 (Md. 1980) ("It is now generally accepted that the parties to a contract may agree as to the law which will govern their transaction, even as to issues going to the validity of the contract.").

## III.   The Maos' Cross-Motion for Summary Judgment

In their Cross-Motion for Summary Judgment, the Maos argue that Paragraph 13 of the Montgomery County Addendum superseded the financing contingency provisions of the main Contract, that as a result, the Contract was generally contingent on the Maos receiving a loan without any required terms or deadlines, and that the Mao's failure to secure a loan therefore voided the contract. They further take the position that pursuant to Paragraph 28 of the Contract, they could be held in default only if they did not "pursue financing diligently and in good faith," and they assert that based on the evidence, a reasonable jury could only conclude that the Maos acted in good faith throughout their efforts to secure a loan. Contract ¶ 28. The Cross-Motion fails because the Court finds, as a matter of law, that the Maos' interpretation of the effect of the Montgomery County Addendum is incorrect.

### A.   Principles of Contract Interpretation

In Maryland, courts follow "the law of objective contract interpretation, which provides that the written language embodying the terms of an agreement will govern the rights and

12

liabilities of the parties, irrespective of the intent of the parties at the time they entered into the contract, unless the written language is not susceptible of a clear and definite understanding." *Dumbarton Improvement Ass'n v. Druid Ridge Cemetery Co.*, 73 A.3d 224, 232 (Md. 2013) (internal quotation marks and citations omitted). Thus, "a contract's unambiguous language will not give way to what the parties thought the contract meant or intended it to mean at the time of execution." *Id.* A court must therefore seek to "determine from the language of the agreement itself what a reasonable person in the position of the parties would have meant at the time it was effectuated." *Id.*

In interpreting contract language, "the court will give effect to its plain, ordinary, and usual meaning, taking into account the context in which it is used." *Sy-Lene of Wash., Inc. v. Starwood Urban Retail II, LLC*, 829 A.2d 540, 546 (Md. 2003). "[T]he contract must be construed in its entirety and, if reasonably possible, effect must be given to each clause so that a court will not find an interpretation which casts out or disregards a meaningful part of the language of the writing unless no other course can be sensibly and reasonably followed." *Dumbarton Improvement Ass'n*, 73 A.3d at 232–33 (quoting *Sagner v. Glenangus Farms, Inc.*, 198 A.2d 277, 283 (Md. 1964)) (internal quotation marks omitted).

Sometimes, however, the plain language of a contract is ambiguous. A contract is ambiguous "if its language is susceptible to multiple interpretations by a reasonable person." *Id.* at 233. In determining whether language is susceptible to multiple interpretations, courts consider "the character of the contract, its purpose, and the facts and circumstances of the parties at the time of execution." *Calomiris v. Woods*, 727 A.2d 358, 363 (Md. 1999) (quoting *Pacific Indem. Co. v. Interstate Fire & Cas. Co.*, 488 A.2d 486, 488 (Md. 1985)). "If the language of the contract is ambiguous, extrinsic evidence may be consulted to determine the intention of the

13

parties." *Pacific Indem. Co. v. Interstate Fire & Cas. Co.*, 488 A.2d 486, 489 (Md. 1985); *see also Chew v. Devries*, 213 A.2d 742, 744 (Md. 1965) ("There is a well-established rule of contractual construction that where two provisions of a contract are seemingly in conflict, they must, if possible, be construed to effectuate the intention of the parties as collected from the whole instrument, the subject matter of the agreement, the circumstances surrounding its execution, and its purpose and design.").

### B.    The Financing Contingency Provisions

In their Cross-Motion for Summary Judgment, the Maos argue that the Montgomery County Addendum unambiguously eliminated the financing contingency provisions in Paragraphs 9, 10, and 11 of the Contract, thus creating a general financing contingency that went unmet by the settlement date.  To support this argument, the Maos point to the language in Paragraph 13 of the Montgomery County Addendum stating that "The provisions of this paragraph shall supersede the 'FINANCING, FINANCING APPLICATION AND COMMITMENT and ALTERNATE FINANCING' paragraphs of the MAR contract." Montgomery County Addendum ¶ 13 (emphasis in original).

Although this point appears to be straightforward, this language needs to be read in conjunction with other provisions of the Contract, because "effect must be given to each clause so that a court will not find an interpretation which casts out or disregards a meaningful part of the language of the writing." *Dumbarton Improvement Ass'n*, 73 A.3d at 232–33.  Paragraph 13 superseded three paragraphs of the "MAR contract," which consists of standard form language. But even if the standard form language in Paragraphs 9, 10, and 11 of the Contract is superseded, the parties' typed, handwritten, and checked-off language specifically inserted into those standard form paragraphs, and initialed by the parties, must be given some effect.  The typed

language in Paragraph 9 called for a financing contingency that would be met by a "30" year "convention[al]" loan of "$800,000" at a fixed interest rate of "4.000" percent.  Contract ¶ 9 (typed language quoted).  The typed language in Paragraph 10 provided that the Maos had to apply for such a loan within "Thirty (30)" days and had to secure a written financing commitment for such a loan within "Thirty (30)" days.  *Id.* ¶ 10 (typed language quoted).  The typed "Thirty (30)" day period within which to apply for the financing was crossed out, and replaced in handwriting by "fifteen" and "15," which was in turn crossed out and replaced again with "Thirty" and "30."  *Id.*

Furthermore, Paragraph 13 of the Montgomery County Addendum, which provides that the contract is contingent on the Buyer obtaining a fixed-rate conventional loan, provides no information on the amount or interest rate for such a loan, except for the language "See Addendum Attached."  Montgomery County Addendum ¶ 13.  No such Addendum was attached, but that language must also be given some effect.

When considered together, the most reasonable interpretation that gives effect to all of these provisions is that Paragraph 13 of the Montgomery County Addendum generally supersedes the boilerplate language in Paragraphs 9, 10, and 11 of the Contract, but that in the absence of an actual addendum referencing the details of the financing contingency, the "See Addendum Attached" language in Paragraph 13 could refer only to the typed and handwritten notations, not explicitly superseded, that the parties' overlay on top of the standard language in Paragraphs 9 and 10 of the Contract.  *Id.*  The Maos' interpretation, that Paragraph 13 simply provides that the contract is contingent on the Maos obtaining before closing a conventional fixed-rate loan of unknown amount, interest rate, or duration, is not plausible because it gives no effect to the typed and handwritten notations specifically negotiated by the parties or the "See

15

Addendum Attached" language that indicates that additional details on the financing contingency are found elsewhere in the Contract. *Id.*

The Maos' interpretation also cannot be reconciled with the General Addendum, incorporated into the Contract on February 21, 2013, which states that "[t]he time for [the Maos] to obtain Loan Commitment Letter and Appraisal will be extended for an additional seven (7) days from the original terms under the Contract." Pl.'s Mot. Ex. 6, General Addendum. Under the Mao's interpretation, the Contract contained no deadline for obtaining a Loan Commitment Letter, so the General Addendum would have no meaning. Only if the parties' typed reference to a 30-day deadline for obtaining a written loan commitment is deemed to be part of the Contract does the General Addendum have any purpose.

At a minimum, these provisions could reasonably be read two different ways, such that the Contract's financing contingency terms would be ambiguous. *See Dumbarton Improvement Ass'n*, 73 A.3d at 233. Once a court determines that contractual language is ambiguous, it may consult extrinsic evidence to determine the intent of the parties. *Pacific Indem. Co.*, 488 A.2d at 489. Extrinsic evidence can include the "negotiations of the parties, the circumstances surrounding execution of the contract, the parties' own construction of the contract and the conduct of the parties." *Canaras v. Lift Truck Servs., Inc.*, 322 A.2d 866, 874 (Md. 1974). If the extrinsic evidence does not raise genuine factual disputes, the Court may resolve the ambiguity on its own. *Pacific Indem. Co.*, 488 A.2d at 489.

Here, the extrinsic evidence bolsters the view that the typed and handwritten additions to Paragraphs 9 and 10 of the Contract, and the standard language necessary to give meaning to those additions, were in effect. First, between the Maos' initial offer on January 22, 2013 and the agreement between the parties on January 30, the primary point of negotiation was whether

16

the Maos would have 15 or 30 days to apply for financing under Paragraph 10. Chaplick countered the Maos' opening offer of a 30-day period by crossing out the typed insertion of "thirty" days and writing in by hand "fifteen" days, presumably to accelerate the timeline toward closing, only to have the Maos reject that counteroffer by crossing out Chaplick's notation and re-writing in "thirty." Contract ¶ 10. Mrs. Mao even sent an email to Chaplick's real estate agent on January 30 notifying him that "I changed it back to 30 days." Pl.'s Reply Supp. Mot. Partial Summ. J. Ex. 29, 30 Days E-mail. This back-and-forth negotiation makes sense only if the parties intended the deadlines for applying for a loan and obtaining a written loan commitment, as inserted into Paragraph 10, to be operative provisions of the Contract.[2]

Second, the parties' subsequent discussions and negotiation over the seven-day extension of that 30-day deadline, which led to the General Addendum, illustrates the parties' intent to have that deadline be operative. In her deposition, Mrs. Mao stated that she intended for the deadline to be extended "[s]even days of the original commitment letter—of the original contract ratified date." Mrs. Mao Dep. at 38.

Third, the fact that the Maos' sent the Commitment Letter to Chaplick before the expiration of that seven-day extension illustrates that the parties intended for the deadline for submitting a written financing commitment, contained in Paragraph 10, to be operative. Significantly, the Maos' deposition testimony indicates that they understood that provision to be in effect. Both Mr. Mao and Mrs. Mao testified that they believed the terms of the Contract required them to obtain a written financing commitment within 30 days of the contract date.

---

[2]  An additional piece of relevant extrinsic evidence is the Greater Capital Area Association of Realtors' standard Conventional Financing Addendum, which reflects that the financing Addendum referenced in Paragraph 13 of the Montgomery County Addendum would typically include the same type of information, such as specific loan terms and deadlines for securing financing, that the parties' negotiated and included in Paragraphs 9 and 10 of the Contract.

Indeed, Mrs. Mao testified that when she sent the Commitment Letter to Chaplick, she knew that she "need[ed] to give them this" so as "to make sure we can buy the house." Mrs. Mao Dep. at 40.

In the face of this extrinsic evidence indicating that the parties intended for the financing contingency terms inserted into Paragraphs 9 and 10, including the 30-day deadline for submission of a written financing commitment, to be included in the Contract, the Maos have identified no countervailing extrinsic evidence indicating that the parties intended to have all of the typed and handwritten notations voided by the Montgomery County Addendum. The Court therefore rejects the Maos' interpretation and concludes that the inserted loan terms and deadlines in Paragraphs 9 and 10 remain as part of the Contract. Because the Maos' Cross-Motion for Summary Judgment relies on its proffered interpretation, and for additional reasons discussed below in resolving Chaplick's Motion for Partial Summary Judgment, the Court denies the Cross-Motion.

## IV.    Chaplick's Motion for Partial Summary Judgment

In his Motion for Partial Summary Judgment, Chaplick seeks summary judgment in his favor on liability for breach of contract because the Maos satisfied the financing contingency by timely submitting the Commitment Letter, but ultimately failed to close on March 21, 2013, as required by the Contract. The Maos argue that because the Commitment Letter included certain conditions, it never removed the financing contingency, so it could be liable for breach only if, under Paragraph 28 of the Contract, it did not continue to pursue financing "diligently and in good faith" up until the date of closing. The Maos assert that the evidence establishes that they met that standard.

### A.     The Financing Contingency

The Court finds that the Maos' submission of the Commitment Letter removed the financing contingency in Paragraph 10.  Under that provision, the Maos' obligation to purchase the Property was contingent on obtaining, within 30 days of the date of contract acceptance, a "written financing commitment" for an $800,000, 30-year, fixed rate loan at an interest rate of 4.000 percent.  Contract ¶ 10.  They met this contingency within the allotted timeframe.  On March 7, 2013, before the seven-day extension in the General Addendum had expired, MCP issued to the Maos a Commitment Letter for an $870,000 loan at a 4.000 percent interest rate, which the Maos forwarded to Chaplick on the same day.  Item by item, the Commitment Letter satisfied all of the terms in the financing provisions of the Contract.  Therefore, the financing contingency was met on March 7, 2013.

The Maos' argument that the financing contingency remained unsatisfied because of the presence of certain conditions misinterprets the contract.  The Commitment Letter noted that the loan was conditioned on "Quality control prior to settlement," "All underwriting and closing conditions," "Appraisal review," and "Receipt and review of IRS tax transcript for 2012."  Pl.'s Mot. Ex. 7, Commitment Letter.  The Contract, however, simply required a "written financing commitment."  Contract ¶ 10.  The word *unconditional* does not qualify that term, and nothing in the Contract prohibited the existence of conditions.  To read this additional term into the Contract would run against the core principle of contract interpretation that "the court will give effect to its plain, ordinary, and usual meaning, taking into account the context in which it is used."  *Sy-Lene of Wash., Inc.*, 829 A.2d at 546.  Indeed, in the context of a real estate transaction, reading into the Contract a requirement that the written financing commitment have no conditions would defy the practicalities of closing on a house, because lenders typically have

19

certain standard conditions such as those listed in the Commitment Letter, which relate to verification of income, assets, and the condition of the property, that need to be met prior to closing.   An implicit requirement for an unconditional loan commitment would render meaningless the term requiring a financing commitment by a certain deadline, which is a standard term in the MAR contract, because there would never be an assurance to the seller that the buyer would be able to close.

Although Maryland courts have not addressed this issue, other courts have declined to read an "unconditional" requirement into comparable loan contingency clauses in real estate contracts.   In *Herrick v. Mike Ford Custom Builders, LLC*, No. M2000-02569-COA-R3-CV, 2001 WL 904299 (Tenn. Ct. App. 2001), where the contract required that the buyer present a "loan commitment" within 14 days and rendered the deposit nonrefundable upon such presentation, the buyer submitted a loan commitment letter that was conditioned on, among other things, "[n]o adverse changes in employment." *Id.* at *1.   When the loan was later denied because the buyer had lost his job, the court rejected the claim that the deposit should be refunded because the loan commitment was conditional, concluding that the plain language of the contract did not require an unconditional loan commitment and that the conditions in the commitment letter, including the employment condition, were part of a standard commitment letter. *Id.* at *2.   In another case, where the contract referred to a "commitment letter" without explicitly requiring the commitment to be unconditional, the court held that a conditional commitment letter would satisfy the contract if the conditions were "of a type reasonably to be expected by the parties." *Friend v. McGarry*, 533 N.Y.S.2d 357, 359 (N.Y. Sup. Ct. 1988) (concluding that a commitment letter with the condition that the buyer sell his existing residence

satisfied the contract requirement because that condition was within the parties reasonable expectations).

The Maos further argue that implicit in the financing contingency provision is a requirement that any conditions be within their "sole control" to meet, and that the condition that they obtain their 2012 IRS tax transcript does not meet that requirement because they were dependent on the IRS to provide it. In support of this theory, they cite *Farrell v. Janick*, 542 A.2d 59 (N.J. Super. Ct. Law Div. 1988), where the buyers' obligation to purchase the property was contingent on securing a "firm written commitment" for a $185,000 conventional mortgage, and the lender provided a loan commitment letter with a condition that the buyers had to sell their existing home for $275,000, a price they did not believe they could attain. *Id.* at 61. When they sought to void the contract based on the inability to secure financing, the seller refused to return the deposit, claiming that the financing contingency had been satisfied by the conditional commitment letter. *Id.* The court held that the loan commitment did not satisfy the financing contingency because the condition was "not within the buyers' sole control but is subject to the vagaries of market conditions and can be satisfied only if another person offers to purchase at the minimum price." *See id.* at 61–62. In a similar case, *McKenna v. Rosen*, 570 A.2d 1277 (N.J. Super. Ct. App. Div. 1990), where there was a requirement for a "mortgage commitment," the lender conditioned a loan on the sale of the buyers' current home at a minimum price, and the seller refused to return the buyers' deposit on the grounds that the financing condition had been satisfied, the court held that the conditional commitment did not meet the requirement because it was "not within the power of the purchaser to control" whether a home could be sold at a certain price. *Id.* at 1278–80.

But a condition that the buyer must sell an existing property at a minimum price is markedly different from the conditions in the Maos' Commitment Letter, which consisted of standard conditions such as quality control, an appraisal review, review of the buyers' tax transcript, and underwriting and closing conditions. Notably, in drawing a distinction between "a contingency which is within the purchasers' sole power to fulfill and a contingency over which the purchasers have no control," *McKenna*, 570 A.2d at 1279, *Farrell* and *McKenna* contrasted selling a home at a minimum price, over which a buyer would have no control, with conditions like providing verification of employment, which is within the buyer's sole control because the buyer would just need to "execute and submit an authorization to secure the necessary documents from his employer." *Farrell* 542 A.2d at 62; *McKenna*, 570 A.2d at 1279. The Maos' conditions, including the tax transcript condition, are akin to a requirement to provide employment verification. Whether submitting a request to the government for a tax transcript, or to an employer for documentation of employment, buyers do not literally have "sole control" over compliance because they are dependent on a third party to provide a response, but such basic conditions associated with securing a mortgage are not the type of conditions that would prevent a loan commitment letter from satisfying a financing contingency requirement such as the one in the Contract. *See Farrell* 542 A.2d at 62; *McKenna*, 570 A.2d at 1279.

Finally, it is noteworthy that unlike the buyers in *Farrell* and *McKenna*, the Maos did not seek to void the Contract, pursuant to Paragraph 10, when their Commitment Letter contained conditions. Although it is true that upon presentation of the Commitment Letter, either party could have sought to void the Contract based on the alleged inability of the Maos to secure satisfactory financing, the Maos, like the buyers in *Farrell* and *McKenna*, were in a far better position than Chaplick to assess whether the limited conditions listed in the Commitment Letter

would pose such a problem that the loan might prove unattainable. Instead, as Mr. Mao stated in his deposition, once the Commitment Letter was submitted they "[a]bsolutely" intended to move forward with the purchase. Mr. Mao Dep. at 19. Thus, once they submitted the Commitment Letter and did not seek to void the Contract, the financing contingency had been satisfied.

## B.     Breach of Contract

With the financing contingency satisfied, the Maos were obligated to close the loan by the settlement date. Paragraph 33 of the Contract, entitled "Default," provides that "Buyer and Seller are required to make full settlement in accordance with the terms of this Contract and acknowledge that failure to do so constitutes a breach thereof." Contract ¶ 33. On March 21, 2013, the date of closing, Chaplick was prepared to sell the Property. It is undisputed that as of that date, the Maos were not prepared to complete the purchase. EverBank had yet to approve the loan. There remained numerous conditions that had yet to be met. Not only had the tax transcript not been secured, but several other closing conditions set by EverBank remained unsatisfied, including providing documentation relating to a large deposit to a BB&T bank account, providing an explanation and documentation relating to four recent deposits to a CitiBank account, providing asset statements for two other bank accounts, and providing additional documentation relating to the Maos' ownership interest in the Essential Realty Group. Thus, the Maos breached the contract by failing to proceed to settlement on March 21.

The Maos argue that they were not in default because even though they were not prepared to settle on March 21, they had met their obligation under Paragraph 28 of the Contract to "pursue financing diligently and in good faith." *Id.* ¶ 28. The parties have contested whether the Maos acted in good faith throughout these events. There is no clear evidence that the Maos did not act diligently and in good faith. Chaplick's claim that the Maos failed to act diligently by

filing a paper tax return rather than an electronic tax return, which appears to have impacted the ability to obtain the 2012 tax transcript in time for settlement, is borderline frivolous. There is ample evidence that the Maos and MPC made substantial efforts to obtain the tax transcript from the IRS, including contacting a member of Congress, but to no avail. The Maos also responded promptly to MPC's requests for information to address EverBank's last minute conditions and satisfied many, but not all, of those conditions. The problem appeared to be that EverBank unexpectedly put forth a large number of closing conditions only three days before closing that were difficult to meet in that time frame. It is not clear whether this situation was the result of MPC failing to disclose earlier EverBank's involvement, MPC and EverBank failing to move quickly enough to process the loan application, or the Maos' finances proving to be more complicated than expected, but the Court cannot find, on this record, that the Maos did not act diligently or in good faith.

But the Maos' reliance on the "good faith" language of Paragraph 28 is misplaced. *Id.* Paragraph 28, entitled "Buyer Responsibility," identifies certain acts or omissions by the Buyer that would allow the Seller to terminate the Contract for default, including misrepresenting the Buyer's ability to consummate the purchase, failing to apply for financing within the specified time period, making misrepresentations in financing documents, taking actions to cause disqualification for financing, or "fail[ing] to pursue financing diligently and in good faith." *Id.* This language plainly states that if the Maos did not act diligently and in good faith in seeking financing, such lack of good faith would constitute default, and Chaplick could void the Contract. Just as plainly, however, it does not state that if the Maos did act diligently and in good faith, they are excused from timely closing on the Property.

24

This conclusion is apparent upon consideration of Paragraph 28 in conjunction with Paragraph 33, entitled "Default," which unequivocally states that failure to "make full settlement in accordance with the terms of this Contract" constitutes a breach of the contract, with no reference to a good faith exception. *See id.* ¶¶ 28 & 33. It further provides that the Seller may retain the deposit "[i]f Buyer fails to make settlement *or* is in default due to Buyer's failure to comply with the terms, covenants, and conditions of this Contract." *Id.* ¶ 33 (emphasis added). Thus, Paragraph 33 indicates that failure to make settlement is a form of breach of contract that is distinct from a "default due to Buyer's failure to comply with the terms, covenants, and conditions" of the Contract, such as the Buyer's responsibilities in Paragraph 28. *Id.* The distinction make sense because a default under Paragraph 28 could be declared long before settlement, such as upon evidence that the Buyer had not diligently and in good faith submitted requested documentation to the lender after applying for a loan, or even after securing a commitment letter, which would allow the Seller to terminate the contract and re-list the property without waiting for the settlement date.

So while it may be true that the Maos did not fail to pursue financing "diligently and in good faith," that would only mean that they were not in default for that specified reason. *Id.* ¶ 28. They may still be in breach of contract under Paragraph 33 for failure to reach settlement by March 21, a basis for default for which good faith is not identified as a defense. Having failed to identify any language in the contract that, once the written financing commitment has been submitted and accepted, placed the risk for failure to consummate the loan on the Seller, the Maos cannot escape liability because they acted in good faith. *Cf. Friend*, 533 N.Y.S.2d at 359–60 (identifying specific language in the contract that shifted to the seller the risk that the loan would not close prior to settlement).

On this record, there is no genuine dispute of material fact that the Maos breached the contract when they were unable to close on the Property on March 21, 2013. Accordingly, Chaplick's Motion for Partial Summary Judgment on liability is granted.

## CONCLUSION

For the foregoing reasons, Chaplick's Motion to Seal is DENIED, the Maos' Cross-Motion for Summary Judgment is DENIED, and Chaplick's Motion for Partial Summary Judgment is GRANTED.  A separate Order shall issue.


Date:  February 26, 2016

THEODORE D. CHUANG
United States District Judge

26