# UNITED STATES DISTRICT COURT
## DISTRICT OF MARYLAND

TREVOR CHAPLICK,
*Trustee for Canal Vista Trust,*

      Plaintiff,

      v.

JENG FEN MAO and
CHIAYEE CHEW MAO,

      Defendants.

Civil Action No. TDC-13-2070

## MEMORANDUM OPINION

On July 17, 2013, Trevor Chaplick ("Chaplick"), as Trustee for Canal Vista Trust ("the Trust"), filed this breach of contract action against Jeng Fen Mao and Chiayee Chew Mao ("the Maos") following the aborted sale of a Maryland residence that overlooks the Potomac River. After the Court granted summary judgment in favor of Chaplick on liability, the Court held a bench trial on damages on November 2 and 21, 2016. Pursuant to Federal Rule of Civil Procedure 52(a), the Court now provides its findings of fact and conclusions of law. For the reasons stated below, the Court awards damages to Chaplick in the amount of $8,231.69.

## BACKGROUND[1]

The residential property at the heart of this action is located at 13728 Canal Vista Court in Potomac, Maryland ("the Property"). In November 2012, Chaplick, on behalf of Canal Vista Trust, listed the Property for sale with an asking price of $1,399,999. On January 22, 2013, the

---

[1]   Additional factual background is set forth in the Court's Memorandum Opinion of February 26, 2016, ECF No. 82, in which the Court granted summary judgment in favor of Chaplick on liability.

Maos offered to purchase the home for $1,280,000. The contract of sale ("the Contract") set a settlement date of March 21, 2013. In its February 26, 2016 Memorandum Opinion, the Court held that the Maos breached the Contract when they were not able to close on the Property on that date. Chaplick then remarketed the Property. On or about April 15, 2013, he entered into a new contract of sale with Abraham Taylor and Silvia Taylor ("the Taylors") for a purchase price of $1,304,500. Chaplick and the Taylors closed on the sale on June 17, 2013.

Even before the Maos breached the Contract, Chaplick had begun to plan litigation against them. On March 19, 2013, having learned that the Maos might not proceed to closing, Chaplick wrote to his realtor that he thought that he was "being played," proposed a 30-day extension if the Maos agreed to pay half of the broker's commission and give up a $20,000 credit originally payable at closing, and threatened that if they did not agree to the proposed terms "we will terminate the contract and pursue litigation aggressively against buyers." Tr. Ex. 102, at 2. Chaplick further instructed the realtor:

> If these terms are not agreed to promptly, we will engage the most experienced trial counsel we can find in Maryland and direct such counsel to initiate litigation against buyers immediately on March 22nd. Please also remind buyers that there is a prevailing party clause in the contract which entitles the party which prevails in any lawsuit to the award of all attorneys fees caused to be incurred by the other party's breach.

*Id.* On March 20, 2013, as negotiations on an extension continued, Chaplick informed his realtors that "I am next going to search for experienced trial counsel in MD to ensure he or she is teed up and ready to go for a lawsuit on Friday morning if this will be necessary." Tr. Ex. 103, at 2. That same day, he reported that he had retained his current trial counsel, "an extremely experienced trial attorney with expertise in real estate litigation" and that his attorney "will be ready on Friday morning to file and serve a complaint on the Maos, Re/Max, and Mortgage

2

Capital Partners, if necessary." Tr. Ex. 104, at 1. He asked his realtors to inform the Maos that "I am a person who does what he says he will do." *Id.*

From March 21, 2013 to June 17, 2013, Chaplick incurred various costs that he alleges were caused by the breach of contract. The Court's factual findings regarding these costs and their nexus to the breach of contract are set forth below.

**DAMAGES FINDINGS**

## I.    Introduction

On October 19, 2016, Chaplick submitted a Trial Brief with attached exhibits in advance of the November 2 trial, including Exhibit 2, a table of requested damages totaling $103,952.58. The requested damages consist of four broad categories: (1) operating costs for the Property for the period from March 21, 2013 to June 17, 2013 ("the Breach Period"); (2) costs of the sale to the Taylors ("the Taylor Sale"); (3) attorney's fees predating the date of breach; and (4) trustee fees.

Chaplick's submission was riddled with misleading information, errors, and unjustified requests. Among the misleading information and facially invalid requests were:

1.    In claiming "Trustee Fees," Chaplick referred to his selected hourly rate as the "Statutory hourly rate for trustee's fees under Maryland guidelines." When challenged, Chaplick acknowledged that there is no statutory hourly rate, or any applicable Maryland guidelines, for trustee fees.

2.    Chaplick claimed as damages monthly payments made on a "Second Mortgage." When challenged, Chaplick conceded that no second mortgage on the Property existed. The loan referenced as a "Second Mortgage" was in fact a personal loan taken out by Chaplick, not the Trust, for approximately $280,000 and was not secured by the Property (hereinafter "the Second Loan").

3.    In claiming monthly interest payments on the actual mortgage on the Property, Chaplick included in his damages request an extra monthly mortgage payment beyond those covering the Breach Period. Likewise, he sought an extra monthly payment on the Second Loan beyond those covering the Breach

3

Period.  On the eve of the trial, Chaplick withdrew his request for these extra payments.

4.     Chaplick requested full payment for a fee relating to Canal Vista LLC ("the LLC"), an entity with no ownership interest in the Property, for tax year 2012, a period that completely or mostly predates the date of breach.

5.     Chaplick submitted a receipt for gutter work performed on February 20, 2013, almost one month before the date of the breach.  After facing questioning at trial on this issue, Chaplick withdrew his request for this payment prior to closing argument.

6.     Chaplick submitted electricity bills covering time periods predating the date of breach.  During the trial, Chaplick conceded that certain of these requested payments were not recoverable.

7.     Chaplick submitted water bills covering time periods predating the date of breach.  During the trial, Chaplick conceded that certain of these requested payments were not recoverable.

8.     Chaplick submitted an inflated request for property insurance payments that he conceded during his testimony overstated the payments relevant to the Breach Period.  Prior to closing argument, he submitted a revised, lower request.

9.     Chaplick submitted a check in the amount of $40 made payable to Montgomery County, Maryland, but he acknowledged during his testimony that he had no knowledge of the reason he made the payment or how it was connected to the Property.

10.     Chaplick submitted two copies of the same invoice for landscaping services performed on April 24, 2013 and requested reimbursement for both.  At closing argument, Chaplick withdrew the second request.

Most of these misleading characterizations and facially invalid requests were withdrawn before or during the trial, after the Court or defense counsel had questioned them.  Nevertheless, the fact that Chaplick requested so many items that the Court easily identified as invalid on the face of the relevant documents casts serious doubt on the reliability and accuracy of Chaplick's request for damages.  At trial, Chaplick acknowledged that his approach consisted of seeking reimbursement for every payment he made during the Breach Period regardless of the date the

services were rendered or whether the expenses related to the Breach Period. The Court concludes that these unjustified and misleading requests derived in part from Chaplick's overly aggressive approach to this dispute generally, as reflected by his threats about and plans for litigation even before the original closing date on the sale. Accordingly, in rendering findings on damages, the Court takes a rigorous approach to analyzing the evidence, relying more heavily on the existence of explicit documentary evidence than on Chaplick's testimony alone.

## II. Legal Standards

"Damages for breach of a contract ordinarily are that sum which would place the plaintiff in as good a position as that in which the plaintiff would have been, had the contract been performed." *Beard v. S/E Joint Venture*, 581 A.2d 1275, 1278 (Md. 1990). The non-breaching party is entitled to damages for losses caused by the breach, that were reasonably foreseeable as a probable result of the breach, and that can be proven with reasonable certainty. *See M&R Contractors & Builders, Inc. v. Michael*, 138 A.2d 350, 353 (Md. 1958); *Hoang v. Hewitt Ave. Assocs., LLC*, 936 A.2d 915, 934 (Md. Ct. Spec. App. 2007) (citing *Impala Platinum, Ltd. v. Impala Sales, Inc.*, 389 A.2d 887, 907 (Md. 1978); *Stuart Kitchens, Inc. v. Stevens*, 234 A.2d 749, 752 (Md. 1967)). Damages are proximately caused where the losses "actually resulted from the breach." *Hoang*, 936 A.2d at 934. Damages are reasonably foreseeable if they are generally "of the sort that are presumed to have been in the contemplation of the parties when the contract was made," or if "evidence of the particular circumstances" establishes that they "may fairly and reasonably be supposed to have been in the contemplation of both parties at the time they made the contract, as the probable result of the breach of it." *Id.* (citing *Winslow Elevator & Mach. Co. v. Hoffman*, 69 A. 394 (Md. 1908)). The Maryland Court of Appeals has emphasized that reasonable foreseeability is to be assessed as of the time of contract formation, not as of the time

of breach. *CR-RSC Tower I, LLC v. RSC Tower I, LLC*, 56 A.3d 170, 184, 188 (Md. 2012). The reasonable certainty requirement, which relates to the likelihood that the damages were incurred as a result of the breach and their probable amount, bars "[l]osses that are speculative, hypothetical, remote, or contingent either in eventuality or amount." *Hoang*, 936 A.2d at 935 (citing *Stuart Kitchens, Inc. v. Stevens*, 234 A.2d 749, 751-52 (Md. 1967)).

Finally, the non-breaching party has a duty to mitigate damages. Specifically, that party has a duty "to make all reasonable efforts to minimize the loss he sustains as a result of the breach" and can recover only those damages that could not be prevented with "reasonable effort and expense without risk of additional substantial loss or injury." *Sergeant Co. v. Pickett*, 401 A.2d 651, 660 (Md. 1979).

## III.    Claim of No Damages

As a threshold issue, the Court addresses the Maos' claim that no damages have been established because, while the plaintiff in this case is Chaplick in his official capacity as Trustee, all expenses claimed as damages were paid by Chaplick personally rather than by the Trust. The Maos note that the checking and credit card accounts from which expenses were paid were Chaplick's personal accounts, so there was no evidence that the Trust had paid any of the costs now claimed as damages.

The Maos' argument does not prevail. The Complaint seeks damages in the form of "costs incurred by the Trust." Compl. 12-13. To the extent that bills were paid to provide a specific benefit to the Property, which was owned by the Trust, they can be construed as costs incurred by the Trust. The fact that Chaplick paid such costs out of his personal accounts does not necessarily indicate that the Trust did not pay such expenses. The Canal Vista Trust Agreement ("the Trust Agreement") indicates that the Trust is a family trust, apparently for

estate-planning purposes, for which Chaplick is the settlor, trustee, and beneficiary all at the same time. None of the formalities of a separate legal entity were observed. To the extent that the Trust had funds, they were commingled with those of Chaplick in his personal accounts. The Court therefore concludes that to the extent that Chaplick paid expenses that provided a specific benefit to the Trust or to the Property, as opposed to Chaplick himself, it is reasonable to infer that those expenses were Trust expenses paid for with Trust funds.

The Court therefore addresses Chaplick's specific claims of damages.

## IV.     Operating Costs

The first category of damages identified by Chaplick is the operating costs of holding and maintaining the Property during the Breach Period. Chaplick seeks as damages: (1) interest payments made on the mortgage on the Property; (2) interest payments made on a line of credit allegedly tied to, but not secured by, the Property; (3) property tax payments; (4) property insurance payments; (5) utility costs; (6) lawn maintenance expenses; (7) costs associated with the LLC; and (8) other miscellaneous costs.

### A.     Mortgage Interest Payments

The Trust had a mortgage on the Property with Citibank. Chaplick made interest-only payments on the mortgage in the amount of $2,460.94 on April 5, 2013, covering March 2013; on May 8, 2013, covering April 2013; and on June 5, 2013, covering May 2013. The prorated amount of interest paid for the period from March 21 to March 31, 2013 is $793.85 (10 out of 31 days). This amount and the two $2,460.94 payments covering April and May 2013 constitute damages because the Trust would not have had to make these payments had the Maos not breached the Contract, and such additional mortgage interest payments were reasonably foreseeable.

7

As for the period from June 1 to June 17, 2013, Chaplick seeks $2,075.48, which is the difference between the payoff amount on the mortgage that Chaplick paid at the closing on June 17, 2013 and the remaining principal on the loan at that time. Chaplick, however, provided no evidence to establish that the difference between those amounts consisted of only unpaid interest relating to the period from June 1 to June 17. The payoff figure could well have included additional charges that would have been included had the loan been paid off upon a sale to the Maos. Accordingly, the Court calculates the paid interest for June 1 to June 17 as $1,394.53, consisting of a prorated amount based on the $2,460.94 standard monthly payment. The Court thus finds that Chaplick is entitled to recover damages for the interest payments made on the mortgage in the amount of **$7,110.26**.

### B.    Interest Payments on Second Loan

Chaplick also claims as damages monthly payments he made during the Breach Period on the Second Loan, a line of credit with Citibank. Although Chaplick originally claimed that this loan was a "Second Mortgage," he conceded that there was no mortgage associated with the loan, and it was never secured by the Property. The loan was taken out by Chaplick personally, not the Trust, and the bank did not require any collateral. According to Chaplick, he opened the line of credit in order to obtain funds to complete the purchase of the Property. Chaplick used funds from his and his wife's personal joint checking account to make a $517.81 interest payment on the Second Loan on March 31, 2013, covering March 2013, and a $535.07 interest payment on May 1, 2013, covering April 2013. On June 8, 2013, he paid off the remaining balance of $281,424.51 with the proceeds from the sale of the Property to the Taylors. Chaplick claims as damages $2,124.92 in payments relating to the Second Loan.

8

The Court does not award damages relating to the Second Loan.  First, the interest payments on this loan were not an operating cost of the Trust relating to the Property.  This was a line of credit in the name of Chaplick in his personal capacity, not the Trust.  It was not secured by the Property.  Thus, the Trust had no obligation to make payments on the loan, Chaplick's payments on the loan from his personal funds conferred no benefit on the Trust or the Property, and any failure to make interest payments would have had no adverse impact on the Property.  Even if the Maos failure to purchase the Property caused Chaplick to have to make additional payments, that was a harm to Chaplick personally, not to the Trust.

Second, under the facts here, these alleged damages were not reasonably foreseeable to the Maos at the time of contracting.  It is foreseeable to a potential buyer that the seller would have a mortgage on the Property, and perhaps a second mortgage secured by the Property, and that the need to make additional mortgage interest payments could result from a breach of contract.  Such mortgages could be readily discovered through a title search.  Here, however, there is no evidence that the Maos knew or should have known about the existence of Chaplick's personal line of credit.  There was no way, through a title search or otherwise, for the Maos to learn about it or any connection it may have to the Property.  The Maos could no more foresee being charged with these interest payments as damages as with responsibility for credit card payments, car loan payments, or any other unsecured obligations that a seller might plan to pay off with the proceeds of a sale.  The Court therefore finds that the interest payments on the Second Loan were not damages incurred by the Trust and were not reasonably foreseeable by the Maos.

### C.    Property Taxes

For the tax year from July 1, 2012 to June 30, 2013, Montgomery County assessed $15,262.97 in taxes on the Property.  Although the Maos argue that there was no specific

evidence establishing who paid these taxes, the Court infers, from Chaplick's testimony and the fact that the full amount was paid, that the Trust paid these taxes. The prorated amount covering the 88-day Breach Period is $3,679.84, an amount which constitutes damages because the Trust would not have had to pay it had the Maos completed the sale on March 21, 2013, and the need for such payment was reasonably foreseeable. The Court finds that Chaplick is entitled to recover damages for the property tax payments in the amount of **$3,679.84**.

### D.      Property Insurance

The annual property insurance premium for the Property for the relevant time period was $2,650. Chaplick paid the premiums covering the Breach Period. Although Chaplick originally claimed an inflated amount of $1,574 in property insurance premiums, the parties now agree that the appropriate figure is $638.90, consisting of the prorated amount of the annual premium covering the Breach Period. Because the need for payment of such additional premiums was caused by the breach of contract and was reasonably foreseeable, Chaplick is entitled to recover **$638.90** in damages for property insurance premium payments.

### E.      Utility Expenses

Chaplick presented documentation for four payments made for electricity bills and two payments made for water and sewer bills. The electricity bills span the period between February 22, 2013 and June 18, 2013. Chaplick now concedes that he is not entitled to payment for electrical services for the period from February 22 to March 21, 2013, which predates the Breach Period. The prorated amount for the period from March 21 to March 25, 2013 is $34.03. The remaining bills are for $119.58 (March 25 to April 22), $88.38 (April 22 to May 21), and $71.97 (May 21 to June 18). The total electricity charges for the Breach Period are therefore $313.96.

On May 27, 2013, Chaplick paid a $28.41 bill for water and sewer services relating to the period from December 18, 2012 to April 3, 2013. The prorated amount for the portion of that

bill covering the Breach Period (March 21 to April 3) is $3.48. On June 8, 2013, Chaplick paid a $54.98 bill for water and sewer services. Because Chaplick paid the full amount due as of April 3, 3013, and because an invoice shows a previous balance of $54.98 as of May 28, 2013, the Court infers that the $54.98 water charge relates to the time period from April 3, 2013 to May 28, 2013. Accordingly, the total water and sewer bill payments relating to the Breach Period are $58.46.

Utility charges and fees incurred during the Breach Period were proximately caused by the Maos' breach and reasonably foreseeable. Accordingly, the Court finds that Chaplick is entitled to **$372.42** in utility payments covering the Breach Period.

### F.    Lawn Maintenance Expenses

Chaplick also seeks as damages the value of payments for lawn maintenance services and materials obtained during the Breach Period. Chaplick made payments to Nelson Franco, a handyman who periodically engaged in landscaping and yard maintenance work on the Property, on March 23, 2013; April 22, 2013; April 28, 2013; May 4, 2013; May 10, 2013; May 19, 2013; May 27, 2013; June 2, 2013; June 9, 2013; and June 13, 2013. These payments total $950. According to Chaplick, Franco was paid for clearing the Property of debris and leaves.

Chaplick also made payments to TruGreen, a lawn care service, for insecticide and lawn treatments, as shown by invoices with service dates of April 16, 2013, April 24, 2013, and May 10, 2013 and a credit card statement showing a payment to TruGreen on June 17, 2013. These payments total $299.99. In addition, Chaplick testified that he purchased sprinklers and a hose from a hardware store and provided a receipt totaling $100.05.

Although the Maos acknowledge that Franco's services were necessary operating costs, they dispute that the TruGreen services were needed. They also argue that the sprinklers were

not foreseeable because they were purchased on April 21, 2013, after the Taylors' contract for sale had been drafted.

The TruGreen invoices reflect that the services consisted of spraying insecticides to protect foliage from pests and disease. Chaplick testified that the sprinklers were necessary to allow for watering to keep the lawn from dying. The Court concludes that these expenses relating to upkeep of the Property's lawn and yard during the Breach Period were reasonably foreseeable operating costs caused by the breach. The Court finds that Chaplick has established **$1,350.04** in damages for lawn maintenance costs.

The Court does not, however, find that Chaplick has provided sufficient evidence to establish that a $531.82 Home Depot credit card charge dated April 14, 2013, reflected on a credit card statement, constituted damages caused by the Maos' breach. Chaplick asserted that because the charge arose from a Home Depot in Gaithersburg, Maryland, it had to relate to the Property because he only went to that location for Property-related materials. However, Chaplick's testimony on what he purchased was unconvincing. He claimed that he purchased mulch and plants for a Property landscaping project for which he had engaged a contractor, *see infra* part V.A, in order to reduce the cost of the work. But all of the written estimates for that project that were introduced as evidence, which were significantly less expensive than the proposal ultimately selected, reflected that the costs of mulch and plants would be included. Furthermore, at his deposition, Chaplick gave an entirely different account, claiming that the Home Depot purchase was for cleaning supplies and sprinklers. With Chaplick's version of events contradicted by his deposition testimony and undermined by documentary evidence relating to the landscaping project, the Court cannot credit it and therefore concludes that there is

insufficient evidence to establish that this charge was proximately caused by the breach or has been proven with reasonable certainty.

### G.    LLC Expenses

Chaplick seeks to recover $250 for a payment made on March 31, 2013 to the Delaware Secretary of State which he described as the annual fee for Canal Vista LLC, an entity he established relating to the Property. The invoice relating to his payment states that the charge was for tax year 2012. He also seeks $280 for a May 27, 2013 payment to Incorporating Services, Ltd. to cover an annual fee for an agent for service of process for the LLC.

Chaplick asserts that these payments, which were made during the Breach Period, would not have been necessary had the Maos purchased the Property. The Court, however, concludes that these payments do not constitute damages arising from the breach of contract. First, the payment to the Secretary of State was for tax year 2012, some or all of which predates the Breach Period. Second, Chaplick testified that he has not yet liquidated the LLC despite closing on the sale to the Taylors in 2013. Based on this admission, the Court finds that Chaplick would not have terminated the LLC immediately after a sale to the Maos, and so the payment of related fees was not proximately caused by the breach. Finally, because these payments relate to an LLC that has no ownership interest in the Property, they were not necessary to the Trust's ownership of the Property, and the LLC's existence was never disclosed to the Maos, the Court concludes that these payments were not reasonably foreseeable consequences of a breach. Accordingly, the Court does not award damages relating to the LLC fees.

## H.     Miscellaneous Expenses

Chaplick seeks as damages various other expenses related to the maintenance of the Property during the Breach Period, including the costs of pest control, security services, painting, house cleaning, gutter work, gasoline, and locksmith services.

Chaplick has provided a pest control service agreement signed April 19, 2013 and invoices for pest control treatment for services in April and May 2013 totaling $265. Chaplick has also presented an invoice dated April 1, 2013 and a cancelled check showing a payment of $76.32 for alarm system monitoring services for a three-month period. Chaplick testified that this invoice covered the period following April 1. The Court finds that the total payments of **$341.32** for pest control and security monitoring constituted operating expenses during the Breach Period and were reasonably foreseeable damages caused by the Maos' breach.

Chaplick testified that he incurred $687 in expenses for touch-up painting, carpentry, and other repairs on the Property and provided a cancelled check in that amount payable to University Painters on April 5, 2013. He also testified that he paid $641.25 for cleaning service on the Property on April 15, 2013 and provided a credit card statement showing a charge in that amount to Maid Brigade in Maryland. The Court finds that these expenses of **$1,328.25** were either operating expenses or costs associated with preparing the Property for sale and thus were reasonably foreseeable damages resulting from the Maos' breach.

Having withdrawn a request for damages relating to gutter repair arising from an invoice listing a service date of February 20, 2013, Chaplick still seeks to recover damages for a $110 charge for "gutter cleaning renewal" dated May 23, 2013. Although Chaplick's testimony in support of the February charge was entirely unconvincing, the invoice listing gutter cleaning services on May 23, 2013 provides sufficient evidence for the Court to conclude that gutter

cleaning services occurred on that date and that the expense was a reasonably foreseeable operating cost resulting from the Maos' breach.  The Court therefore finds that Chaplick is entitled to recover the **$110** expense for gutter cleaning services.

Chaplick further requests damages for gas expenses incurred traveling to and from the Property.  Chaplick provided a credit card bill showing a purchase at a Maryland gas station of $48.53 dated April 17, 2013 and a Maryland gas station receipt for $58.99 dated June 10, 2013. He testified that as a Virginia resident, he incurred gasoline expenses while traveling to or from the Property to attend to it.  Although some gasoline costs may have been proximately caused by the Maos' breach and reasonably foreseeable, the amount requested has not been established with reasonable certainty because Chaplick has not provided any estimate of, or evidence to establish, the portion of the two tanks of gas purchased that was consumed while driving for Property business.  He cannot credibly claim that the entirety was used for that purpose.  Lacking evidence to establish reasonable certainty as to amount, the Court finds that Chaplick is not entitled to recover for these gasoline charges.

The Court also finds that Chaplick is not entitled to recover for a $265.65 payment made on April 29, 2013 to repair a lock that was damaged by a realtor.  Chaplick testified that the damage was caused when a realtor showing the Property accidentally broke the lock.  The Court concludes that because of the intervening act of the realtor's action, the Maos' breach of contract was not the proximate cause of the repair costs and denies this request.

## V.    Costs of the Taylor Sale

The second category of identified damages is the cost of the sale to the Taylors, which can be further divided into three categories:  a capital expenditure on landscaping, repairs and

improvements related to the Taylors' inspection, and attorney's fees paid for reviewing and assisting with the contract of sale between Chaplick and the Taylors.

### A.    Landscaping Project

Chaplick claims as damages $9,255 paid to Colonial Landscape & Design ("Colonial") on April 17, 2013, as reflected by a cancelled check, for a landscaping project on the Property that he testified was undertaken to prepare the Property for sale. Chaplick testified that, after he fielded a number of bids, he chose Colonial because it allowed for the most work to be done at the lowest price. Although no written proposal or invoice from Colonial was offered as evidence, Chaplick provided four written estimates by other contractors in the amounts of $5,203 (Distinct Landscapes – first proposal), $7,239 (Distinct Landscapes – second proposal), $5,820 (Pro Landscaping) and $4,907.20 (Garden Gate Landscaping). The project ultimately selected substantially exceeded Chaplick's budget, as referenced in an email, of approximately $5,000.

Although Chaplick claims that this project was necessary in order to have the Property resold, there are substantial questions as to whether that is true. Chaplick has argued that it would be difficult to sell the Property during spring or summer because the growth of leaves on trees would block the view of the Potomac River, but the landscaping project, which consisted primarily of spreading mulch and adding shrubs to the front of the house, had nothing to do with the view. No evidence was offered to establish that the Taylors would not have purchased the Property in the absence of such landscaping. Indeed, there is no clear evidence on whether the work took place before the Taylors first viewed the Property. The Taylors' contract for sale was drafted on April 15, 2013, two days before Chaplick paid Colonial.

Nevertheless, Chaplick persuasively argues that the coming of spring necessitated some landscaping in order to attract buyers, and the higher sales price offered by the Taylors provides

16

evidence to indicate that improvements were needed to achieve the eventual sales price. The Court therefore concludes that some landscaping work was reasonably foreseeable and proximately caused by the breach.

The Court concludes, however, that the $9,255 expended on landscaping far exceeded what was necessary or reasonably foreseeable. Chaplick himself set a budget of $5,000 for this project. Of the estimates available, Chaplick selected what was by far most the expensive option without providing any documentary support for such a selection. In doing so, Chaplick violated his duty to mitigate damages and also incurred excess costs that were not reasonably foreseeable to the Maos at the time of contracting. Because Chaplick initiated steps toward litigation against the Maos as early as March 19, the Court finds that the selection of the most expensive option at a price significantly higher than his initial budget was motivated in part by the assumption that the costs could be charged to the Maos. Accordingly, the Court finds that the necessary and reasonably foreseeable amount of damages was **$5,203** (Distinct Landscapes -- first proposal), consisting of the lowest estimate that included both mulch and shrubs in the proposal.

## B.  Home Repairs and Improvements

Chaplick also seeks as damages expenses relating to repairs and improvements to address items identified in the Taylors' home inspection and other requests by the Taylors that had to be met to consummate the sale. These items included $4,188 on replacement windows, $1,810 on radon and mold remediation work, $1,480 on floor replacement, plumbing, and mold remediation work, and $469.66 for washing machine repairs.

Chaplick provided an invoice and credit card bill showing payment for the replacement windows on June 10, 2013. An email from Chaplick's realtor indicated that the Taylors had asked for certain replacement windows, to which Chaplick replied by complaining about the

Taylors' requests arising from the home inspection.    The radon and mold remediation expenditures are supported by invoices and consisted of payments dated June 1, 2013 and June 6, 2013 of $1,210 and $600, respectively.  An invoice from University Painters dated June 5, 2013 substantiates the floor replacement, plumbing, and mold remediation work and indicates that the work related to a home inspection.  Chaplick also provided invoices reflecting washing machine repairs in late May 2013 in the amounts of $50, $329.71, and $89.95.

The Maos argue that Chaplick failed to offer the Taylors' home inspection report as evidence and imply that it would refute Chaplick's claims that these expenditures were related to the inspection.    They acknowledge, however, that the inspection report was produced in discovery, so either side could have offered it into evidence.  The Maos also claim that the mold work related to issues already remediated after the Maos' home inspection and therefore should have been addressed by requiring the same contractor to redo the work at no charge.  But the Maos do not offer evidence to substantiate that claim.  Thus, based on the documentation provided, which supports the conclusion that Chaplick paid for these improvements in order to satisfy the Taylors, the Court finds that these expenditures were proximately caused by the Maos' breach and were reasonably foreseeable.  Chaplick is entitled to recover **$7,947.66** in damages for the costs of these repairs and improvements.

### C.     Attorney's Fees on the Taylor Sale

Chaplick seeks to recover $7,722 in damages for legal fees incurred for negotiating the contract of sale with the Taylors.  Chaplick retained David Kochanski of Shulman, Rogers, Gandal, Pordy, & Ecker, P.A., who billed for 15.6 hours of work at a rate of $495 per hour. Chaplick has provided an invoice detailing the work performed, the time expended, and the applicable hourly rate.

18

The Maos argue that it is not necessary to retain an attorney for a real estate transaction involving a single-family residence where the agreement was a standard form contract. While that may be true, the Court concludes that retaining an attorney for a real estate transaction is reasonably foreseeable under the circumstances. Chaplick did retain counsel for the Taylor Sale, so the attorney's fees were proximately caused by the Maos' breach. However, the Court concludes that Chaplick is not entitled to the full amount requested. First, Chaplick had a duty to mitigate damages and was thus obligated to incur no more legal fees than necessary to complete the transaction. The Court concludes that for this type of transaction, with this type of contract, it was not necessary to retain an attorney at $495 per hour. Significantly, this Court's guidelines for hourly rates, used for calculating reasonable attorney's fees in federal court litigation, including trial work, have a maximum hourly rate of $475 for the most experienced attorneys. D. Md. Local R. App. B ¶ 3. Second, for the same reason, the Court concludes that the Maos could not have reasonably foreseen such a high charge for representation in this type of sale. Accordingly, the Court reduces the damage award relating to legal services for the Taylor Sale to **$3,900**, calculated by applying to the stated hours a rate of $250 per hour. This figure represents the approximate hourly rate under this Court's guidelines for an attorney with ten years of experience, *id.*, which would be more than sufficient to advise a seller of a single-family home using a standard form contract.

## VI.     Pre-Breach Attorney's Fees

Chaplick also seeks $4,109 in attorney's fees incurred prior to the breach of contract on March 21, 2013. At trial, Chaplick testified that these attorney's fees were incurred because when breach was imminent, his realtors informed him that they would not re-list the Property for sale unless they had a letter from an attorney providing a legal opinion that the Maos had breached the Contract. In an email dated March 21, 2013, Chaplick advised his realtor, "You

simply need a letter from a credible law firm indicating that the buyers are in material breach" and that his attorney would provide such a letter. Tr. Ex. 110, at 1. However, in an email sent on March 19, 2013, Chaplick stated that "we will engage the most experienced trial counsel we can find in Maryland and direct such counsel to initiate litigation against buyers immediately on March 22nd." Tr. Ex. 102, at 2. The next day, on March 20, Chaplick sent another email stating that "I am next going to search for experienced trial counsel in MD to ensure he or she is teed up and ready to go for a lawsuit on Friday morning if this will be necessary." Tr. Ex. 103, at 2. That same day, he reported that he had retained his current trial counsel, "an extremely experienced trial attorney with expertise in real estate litigation" and that his attorney "will be ready on Friday morning to file and serve a complaint on the Maos, Re/Max, and Mortgage Capital Partners, if necessary." Tr. Ex. 104, at 1.

"Maryland follows the American rule which 'stands as a barrier to the recovery, as consequential damages, of foreseeable counsel fees incurred in enforcing remedies for' breach of contract." *Bausch & Lomb Inc. v. Utica Mut. Ins. Co.*, 735 A.2d 1081, 1094 (Md. 1999) (quoting *Collier v. MD–Individual Practice Ass'n*, 607 A.2d 537, 543 (Md. 1992)). Under this rule, "in the absence of a statute, rule or contract expressly allowing the recovery of attorney's fees, a prevailing party in a lawsuit may not ordinarily recover attorney's fees." *Id.* Thus, for Chaplick to recover the requested attorney's fees, he must establish that the fees were incurred not to enforce remedies, but as a form of damages caused by the breach of contract.

If the fees, in fact, were incurred only in order to procure an attorney's letter to allow the realtors to re-list the Property, they arguably could be construed as a necessary cost of the Taylor Sale that could constitute damages arising from the breach of contract. Chaplick, however, has failed to provide sufficient proof to establish that the attorney's fees constituted such damages.

First, Chaplick has not provided any billing records or other documentary support for the amount or purpose of the attorney's fees.[2] The Court therefore cannot be satisfied that all, or even part, of the attorney's fees were incurred for this purpose. In particular, the Court cannot make such a finding because Chaplick's testimony is contradicted in part by the emails immediately preceding the breach of contract which explicitly state that he retained an attorney in whole or in part to draft a complaint to initiate litigation against the Maos. Accordingly, the Court does not credit Chaplick's claim that the requested attorney's fees were solely or even primarily for the purpose of drafting a letter for his realtors opining that the Maos' had breached the Contract. Because Chaplick has neither proven that these attorney's fees qualified as damages, nor established the amount with reasonable certainty, the Court does not grant the request.

## VII.  Trustee Fees

Chaplick also seeks $50,680 in trustee fees, consisting of 126.7 hours of work that he performed at a rate of $400 per hour. Under Chaplick's theory, he is entitled to recover as damages the value of the time he expended post-breach in the capacity of Trustee in order to maintain the Property and arrange for its sale to the Taylors. Chaplick selected a proposed rate of $400 per hour because that figure is half of his $800 per hour billable rate as a corporate attorney in private practice in Washington, D.C.

### A.    Facts

Prior to the sale to the Taylors, the Property was owned by Canal Vista Trust. The Trust was established on April 16, 2008, with Chaplick and his wife, Vivian Chaplick, as the settlors, for the specific purpose of owning the Property. The beneficiaries of the Trust are Chaplick, his wife, and their children. The sole property in the Trust was the Property. Chaplick also

---

[2]   Chaplick offered an exhibit on this issue, but the Court granted the Maos' Motion *in Limine* to exclude the exhibit on the grounds that it was never produced in discovery.

established the LLC in order to facilitate the establishment of a bank account from which he could pay bills for the Trust.

The Trust Agreement describes the fiduciary powers of the Trustee, which include the powers to retain, lease, repair, improve, and sell estate property, as well as the powers to "pay taxes and to pay for repairs and other expenses incurred in the management, collection, care, administration and protection of the estate" and to borrow money in the name of the Trust. Trust Agreement Ex. 13, at 7-16. The Trust Agreement provides that "Any individual serving as Trustee shall be entitled to reasonable compensation for fiduciary services." *Id.* at 7. The agreement further provides that:

> The fiduciary shall be entitled from any assets held by or controlled by the trust estate to be paid reasonable compensation for services rendered as fiduciary and shall be compensated or reimbursed for costs, expenses, liabilities imposed upon the estate or the fiduciary in his or her capacity as such; and, similarly, the fiduciary shall be compensated for reasonable services rendered in any other non-fiduciary capacity involving services performed on behalf of or for the trust.

*Id.* at 13.

The initial Trustee was David Kochanski, an attorney. Following Kochanski's resignation, Chaplick and his wife became co-Trustees. When Vivian Chaplick resigned as Trustee in March 2012, Chaplick became the sole Trustee. During the time period of the proposed sale to the Maos and the actual sale to the Taylors, Chaplick paid expenses relating to the Property out of his personal checking account, not a Trust or LLC bank account. In his email and other correspondence relating to the Property, Chaplick did not identify himself as the Trustee or state that the correspondence was sent in his capacity as Trustee. There is no evidence that, prior to the breach, Chaplick ever informed the Maos that he was acting as a trustee who would be compensated for his services or that he provided a copy of the Trust Agreement to the Maos.

In his role as Trustee, Chaplick has never entered into any agreement with the Trust that would set the terms of his compensation, such as a contract that would provide for an hourly rate. During his tenure as Trustee, Chaplick never billed the Trust for his services and never sought or obtained compensation from the Trust. Even during the negotiations with the Maos for the possible purchase of the Property, Chaplick never tracked his time or billed the Trust for his services. According to Chaplick, he never did so because it would have involved writing a check to himself from his own bank account, which would be unnecessary. As for expenses incurred during the Breach Period, Chaplick has never submitted a bill to the Trust or received compensation from the Trust for his services. Even as of the date of his testimony, Chaplick had no plan to bill the Trust for his expenses.

The Court therefore concludes that until this litigation, Chaplick had no intention of seeking reimbursement from the Trust for his expenses. The first time he sought to track his time as Trustee was as part of this litigation, when he sought to track his hours for the purpose of manufacturing additional damages in this case. The Court infers that such fees were included in part to reach the $75,000 threshold for diversity jurisdiction as required to bring this action in federal court.

### B. Analysis

The Maos argue that Chaplick cannot recover trustee fees because he cannot be reimbursed for such fees where he is also the beneficiary of the trust, and because such fees do not satisfy the requirements for damages under Maryland law. First, the Maos argue that allowing Chaplick to recover trustee fees is analogous to awarding attorney's fees to an attorney proceeding *pro se*. Under Maryland law, an attorney proceeding *pro se* is not entitled to collect attorney's fees either pursuant to a contractual provision allowing for such fees or under the

Maryland Rules. *See Weiner v. Swales*, 141 A.2d 749, 750 (Md. 1958); *Frison v. Mathis*, 981 A.2d 57, 60-63 (Md. Ct. Spec. App. 2009). These rulings are based primarily on the language of Maryland Rule 1-341, which permits recovery of attorney's fees "incurred," comparable language in particular contractual provisions at issue, and the conclusion that a self-represented attorney does not actually "incur" any legal fees. *Frison*, 981 A.2d at 62.

Because this textual analysis does not apply here, the case law relating to attorney's fees does not control in this case. Nevertheless, the analogy has some persuasive force. An individual who is both attorney and client does not actually incur legal fees because there is no need to do so, since any charges would be paid by and to the same person. Likewise, where Chaplick is settlor, trustee, and beneficiary, he has acknowledged that charging for trustee fees does not make any sense because it would consist of writing a check to himself. The selection of the trust structure to own a home, especially where none of its formalities are observed, should not entitle a homeowner to be paid for time relating to the sale of the property which other homeowners would expend in the ordinary course without any expectation of compensation. Moreover, the Maryland Court of Special Appeals has identified a public policy reason for preventing *pro se* attorneys from recovering attorney's fees, specifically that "one should not become one's own client and charge for professional services and that attorneys representing themselves might be tempted to protract litigation for their own financial betterment" if permitted to recover fees. *Id.* at 63 (quoting *Connor v. Cal-Az Properties, Inc.*, 668 P.2d 896, 899 (Ariz. Ct. App. 1983)). Here, where Chaplick acted on his own behalf as trustee and beneficiary, he had a similar incentive to incur charges that would directly benefit himself.

The Court need not decide whether, as a rule, a trustee who is also settlor and beneficiary can claim trustee fees as damages, because Chaplick has not established as a factual matter that

his proposed trustee fees satisfy the requirements for damages. First, even though the Trust Agreement allows for a trustee to receive compensation, Chaplick has not established that the Trust has suffered any damages in the form of trustee fees actually incurred. Chaplick has not billed the Trust for his time, and there is no evidence that the Trust has paid the itemized trustee fees to Chaplick or has any current debt to Chaplick for the trustee fees sought. The fact that Chaplick never billed the Trust throughout its history for any work relating to the Property, including during the period leading up to the Maos' breach of contract, reinforces the conclusion that the Trust does not owe Chaplick any trustee fees. Thus, Chaplick has failed to show any damages to the Trust in the form of trustee fees incurred.

Second, even if the Trust had incurred a loss or debt arising from trustee fees, such damages were not reasonably foreseeable to the Maos at the time they entered into the Contract. Although the available documentation presumably indicated that the Property was owned by a trust, the Trust Agreement indicates that the Trust was effectively a family trust established for estate planning purposes, and the Trust did not operate any differently than if Chaplick had owned the Property directly. No Trust bank account was used, and none of the correspondence or payments by Chaplick ever identified him as acting in the role of a trustee such that the Maos could reasonably expect that they might have to compensate him for the time he spent relating to the Property. Moreover, the Contract includes no provision discussing trustee fees as a potential obligation in the event of a breach of contract, there is no evidence that the Trust Agreement was provided to the Maos, and there was no other evidence that the Maos were ever made aware that Chaplick was acting in the role of a trustee, property manager, or other similar role such that he would be entitled to compensation for professional services, and certainly not at $400 per hour. Indeed, prior to filing this lawsuit, Chaplick himself had never taken any steps toward charging

the Trust for his services. It was only after he had concluded in his own mind that the Maos had acted in bad faith, then threatened and initiated litigation, that he first sought to calculate his hours expended and conjure up an hourly rate to apply. Under these circumstances, the Court concludes that damages in the form of trustee fees claimed by Chaplick were not reasonably foreseeable to the Maos.

Finally, Chaplick has not established damages with any reasonable certainty, particularly as to the amount, because he has provided no acceptable method of calculation. Although Chaplick initially claimed that his proposed $400 hourly rate derived from a Maryland statute or formal guidelines, he quickly abandoned that false claim. There was never any written or unwritten agreement between the Trust and Chaplick on a particular hourly rate, because Chaplick never planned to charge the Trust for his time. Rather, once Chaplick decided to manufacture trustee fees as an item of damages for purposes of this litigation, in part to meet the threshold for federal jurisdiction, he unilaterally adopted the $400 per hour rate because it is 50 percent of his billing rate as an attorney. The Trustee work, however, is not legal in nature; in fact, much of the work for which compensation is sought is similar to the work of a property manager. Indeed, Chaplick retained separate counsel to represent the Trust on the legal issues arising from the breach. Accordingly, the Court finds no principled basis to apply the self-serving $400 hourly rate. In the absence of any actual hourly rate agreed to in advance by both the Trust and Chaplick, the Court cannot calculate the amount of trustee fees with any reasonable certainty. For these reasons, the Court concludes that Chaplick has not met his burden to establish the requested trustee fees as damages.

## VIII.   Final Damages Calculation

Based on the findings above, the Court calculates that Chaplick sustained $31,981.69 in damages arising from the Maos' breach of contract. However, Chaplick received some benefit from the breach because the Taylors paid a higher purchase price, $1,304,500, than the Maos had agreed to pay, $1,280,000, for a gain to Chaplick of $24,500. Because the higher purchase price resulted in a broker's fee that was $750 higher, the net gain to Chaplick was $23,750. The damages amount must be reduced by the amount of this net gain.

Thus, the Court awards to Chaplick damages in the amount of $8,231.69.

## CONCLUSION

For the foregoing reasons, the Court awards damages to Chaplick in the amount of $8,231.69. A separate Order shall issue.

Date:  December 5, 2016

THEODORE D. CHUANG
United States District Judge